CLOSED,PASPRT

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CRIMINAL DOCKET FOR CASE #: 2:19-mj-00987-DUTY-1

Case title: USA v. Khosroshahin

Date Filed: 03/12/2019
Date Terminated: 03/12/2019

Assigned to: Duty Magistrate Judge

### Defendant (1)

**Ali Khosroshahin**
*TERMINATED: 03/12/2019*

represented by **Michael H Artan**
Law Office of Michael H Artan PC
One Wilshire Boulevard Suite 2200
Los Angeles, CA 90017
213-688-0370
Fax: 213-627-9201
Email: michaelartan@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| None | |

| **Highest Offense Level (Opening)** | |
| --- | --- |
| None | |

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

| **Highest Offense Level (Terminated)** | |
| --- | --- |
| None | |

| **Complaints** | **Disposition** |
| --- | --- |
| Defendant in violation of 18:1962 | |

### Plaintiff

**USA**

represented by **US Attorney's Office**
AUSA - Office of US Attorney
Criminal Div - US Courthouse
312 N Spring St, 12th Floor
Los Angeles, CA 90012-4700

213-894-2434
Email: USACAC.Criminal@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/12/2019 | 1 | AFFIDAVIT RE: OUT-OF-DISTRICT WARRANT (Rule 5(c)(3)) filed as to defendant Ali Khosroshahin, originating in the District of Massachusetts. Defendant charged in violation of: 18:1962. Signed by agent Timothy A Jacoby, FBI, Special Agent. (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 2 | REPORT COMMENCING CRIMINAL ACTION as to Defendant Ali Khosroshahin; defendants Year of Birth: 1970; date of arrest: 3/12/2019 (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 3 | Defendant Ali Khosroshahin arrested on warrant issued by the USDC District of Massachusetts at Boston. (Attachments: # 1 Charging Document)(ja) (Entered: 03/14/2019) |
| 03/12/2019 | 4 | MINUTES OF ARREST ON OUT OF DISTRICT WARRANT held before Magistrate Judge Alexander F. MacKinnon as to Defendant Ali Khosroshahin Defendant arraigned and states true name is as charged. Attorney: Michael H Artan for Ali Khosroshahin, Retained, present. Court orders bail set as: Ali Khosroshahin (1) $100,000 Appearance Bond, SEE ATTACHED BOND FOR TERMS AND CONDITIONS. Defendant remanded to the custody or currently in the custody of the US Marshal. Court orders defendant held to answer to District of Massachusetts. Bond to Transfer. Defendant ordered to report on 3/25/19 at 2:30 PM. Release Order No 39605. Court Reporter: Amy Diaz. (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 5 | PASSPORT RECEIPT from U. S. Pretrial Services as to Defendant Ali Khosroshahin. USA passport was received on 3/12/19. (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 6 | ADVISEMENT OF STATUTORY & CONSTITUTIONAL RIGHTS filed by Defendant Ali Khosroshahin. (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 7 | BOND AND CONDITIONS OF RELEASE filed as to Defendant Ali Khosroshahin conditions of release: $100,000 Appearance Bond approved by Magistrate Judge Alexander F. MacKinnon. (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 8 | REDACTED AFFIDAVIT OF SURETIES (No Justification - Pursuant to Local Criminal Rule 46-5.2.8) in the amount of $50,000 by surety: Nilofar K Wardrup for Bond and Conditions (CR-1) 7 . Filed by Defendant Ali Khosroshahin (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 9 | SEALED UNREDACTED Affidavit of Surety (CR-4) filed by Defendant Ali Khosroshahin re: Affidavit of Surety (No Justification)(CR-4) 8 (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 10 | REDACTED AFFIDAVIT OF SURETIES (No Justification - Pursuant to Local Criminal Rule 46-5.2.8) in the amount of $50,000 by surety: Allison Khosroshahin for Bond and Conditions (CR-1) 7 . Filed by Defendant Ali Khosroshahin (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 11 | SEALED UNREDACTED Affidavit of Surety (CR-4) filed by Defendant Ali Khosroshahin re: Affidavit of Surety (No Justification)(CR-4) 10 (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 12 | DECLARATION RE: PASSPORT filed by Plaintiff USA as to Defendant Ali Khosroshahin, declaring that my passport and any other travel documents are in the possession of federal authorities. If any such document is returned to me during the |

| | | |
|---|---|---|
| | | pendency of this case, I will immediately surrender it to the U.S. Pretrial Services Agency. I will not apply for a passport or other travel document during the pendency of this case. RE: Bond and Conditions (CR-1) 7 . (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 13 | DESIGNATION AND APPEARANCE OF COUNSEL; filed by Michael H Artan appearing for Ali Khosroshahin (ja) (Entered: 03/14/2019) |
| 03/12/2019 | 14 | WAIVER OF RIGHTS approved by Magistrate Judge Alexander F. MacKinnon as to Defendant Ali Khosroshahin. (ja) (Entered: 03/14/2019) |
| 03/14/2019 | | Notice to District of Massachusetss of a Rule 5 Initial Appearance as to Defendant Ali Khosroshahin. Your case number is: CR 19-10081. The clerk will transmit any restricted documents via email. Using your PACER account, you may retrieve the docket sheet and any text-only entries via the case number link. The following document link(s) is also provided: 4 Initial Appearance - Arrest on Out of District Warrant - Rule 5(c)(3) (fka Rule 40). The Clerk will forward the passport to you If you require certified copies of any documents, please send a request to email address CrimIntakeCourtDocs-LA@cacd.uscourts.gov (ja) (Entered: 03/14/2019) |

*FILED*

2019 MAR 12 AH 9: 12

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| United States of America | | CASE NUMBER |
|---|---|---|
| | **PLAINTIFF(S)** | **19 MJ00987** |
| v. | | |
| Ali Khosroshahn | | **AFFIDAVIT RE** |
| | **DEFENDANT(S).** | **OUT-OF-DISTRICT WARRANT** |

The above-named defendant was charged by: ___Complaint___
in the _____ District of ___Massachusetts___ on ___3/5/2019___
at _____ ☐ a.m. / ☐ p.m. The offense was allegedly committed on or about _____
in violation of Title ___18___ U.S.C., Section(s) ___1965 d___
to wit: _____

A warrant for defendant's arrest was issued by: ___M. Page Kelley___

Bond of $_____ was ☐ set / ☐ recommended.

Type of Bond:

Relevant document(s) on hand (attach):

I swear that the foregoing is true and correct to the best of my knowledge.

Sworn to before me, and subscribed in my presence on ___3/12/19___, by

___Cindy Ollies___ Deputy Clerk.

| | |
|---|---|
| _(signature)_ | ___Timothy A. Jacoby I___ |
| **Signature of Agent** | **Print Name of Agent** |
| ___FBI___ | ___Special Agent___ |
| **Agency** | **Title** |

FILED

2019 MAR 12  AM 9: 12

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | CASE NUMBER: |
|---|---|
| v.                    PLAINTIFF | 19 MJ 00987 |
| Ali Khosroshahih        DEFENDANT | REPORT COMMENCING CRIMINAL ACTION |

TO: CLERK'S OFFICE, U.S. DISTRICT COURT

All areas must be completed. Any area not applicable or unknown should indicate "N/A".

1. Date and time of arrest:  7/12/2019    6:05    ☒ AM  ☐ PM

2. The above named defendant is currently hospitalized and cannot be transported to court for arraignment or any other preliminary proceeding:  ☐ Yes  ☒ No

3. Defendant is in U.S. Marshals Service lock-up (in this court building):  ☒ Yes  ☐ No

4. Charges under which defendant has been booked:

Conspiracy to commit racketeering (18 USC 1962 d)

5. Offense charged is a:  ☒ Felony   ☐ Minor Offense   ☐ Petty Offense   ☐ Other Misdemeanor

6. Interpreter Required:  ☒ No   ☐ Yes   Language: _____

7. Year of Birth:  1970

8. Defendant has retained counsel:  ☒ No
   ☐ Yes   Name: _____   Phone Number: _____

9. Name of Pretrial Services Officer notified:  Devon

10. Remarks (if any): _____

11. Name:  SA Timothy G. Jacoby II   (please print)

12. Office Phone Number:  714-939-3242     13. Agency:  FBI

14. Signature:  [signature]     15. Date:  03/12/2019

CR-64 (2/14)                    REPORT COMMENCING CRIMINAL ACTION

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

United States of America
v.
ALI KHOSROSHAHIN

Defendant

)
)
)
)
)

Case No.

19cr 10081

**19 MJ 00987**

FILED

SEALED

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   ALI KHOSROSHAHIN

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to commit racketeering (18 USC 1962(d))

Date:   03/05/2019

City and state:   Boston, MA

_____
*Issuing officer's signature*

M. Page Kelley, US Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____          _____ |
|                                           *Arresting officer's signature* |
|                                           _____ |
|                                           *Printed name and title* |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 19-cr-10081 |
| | ) | |
| v. | ) | Violations: |
| | ) | |
| (1)   GORDON ERNST, | ) | Count One: Racketeering Conspiracy |
| (2)   DONNA HEINEL, | ) | (18 U.S.C. § 1962(d)) |
| (3)   LAURA JANKE, | ) | |
| (4)   ALI KHOSROSHAHIN, | ) | Racketeering Forfeiture Allegations: |
| (5)   STEVEN MASERA, | ) | (18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 1963 |
| (6)   MIKAELA SANFORD, | ) | and 28 U.S.C. § 2461) |
| (7)   MARTIN FOX, | ) | |
| (8)   IGOR DVORSKIY, | ) | |
| (9)   LISA "NIKI" WILLIAMS, | ) | |
| (10)  WILLIAM FERGUSON, | ) | |
| (11)  JORGE SALCEDO, and | ) | |
| (12)  JOVAN VAVIC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

SEALED

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.      Defendant GORDON ERNST ("ERNST") was a resident of Chevy Chase, Maryland and Falmouth, Massachusetts. Until January 2018, ERNST was employed as the head coach of men's and women's tennis at Georgetown University.

2.      Defendant DONNA HEINEL ("HEINEL") was a resident of Long Beach, California. HEINEL was employed as the senior associate athletic director at the University of Southern California.

3.   Defendant ALI KHOSROSHAHIN ("KHOSROSHAHIN") was a resident of Fountain Valley, California. Until November 8, 2013, KHOSROSHAHIN was employed as the head coach of women's soccer at the University of Southern California.

4.   Defendant LAURA JANKE ("JANKE") was a resident of North Hollywood, California. Until January 10, 2014, JANKE was employed as an assistant coach of women's soccer at the University of Southern California. JANKE reported to KHOSROSHAHIN until his departure from the university.

5.   Defendant JOVAN VAVIC ("VAVIC") was a resident of Rancho Palos Verdes, California. VAVIC was employed as the water polo coach at the University of Southern California.

6.   Defendant JORGE SALCEDO ("SALCEDO") was a resident of Los Angeles, California. SALCEDO was employed as the head coach of men's soccer at the University of California at Los Angeles.

7.   Defendant WILLIAM FERGUSON ("FERGUSON") was a resident of Winston-Salem, North Carolina. FERGUSON was employed as the women's volleyball coach at Wake Forest University.

8.   Defendant LISA "NIKI" WILLIAMS ("WILLIAMS") was a resident of Houston, Texas. WILLIAMS was employed as an assistant teacher at a public high school in Houston. WILLIAMS also served as a compensated standardized test administrator for the College Board and ACT, Inc.

9.   Defendant MARTIN FOX ("FOX") was a resident of Houston, Texas. FOX was employed as the president of a private tennis academy and camp in Houston.

10.   Defendant IGOR DVORSKIY ("DVORSKIY") was a resident of Sherman Oaks, California. DVORSKIY was employed as the director of a private elementary and high school

2

located in Los Angeles, California. DVORSKIY also served as a compensated standardized test administrator for the College Board and ACT, Inc.

11.     Defendant STEVEN MASERA ("MASERA") was a resident of Folsom, California. Until December 2017, MASERA was employed as an accountant and financial officer for the Edge College & Career Network, LLC and the Key Worldwide Foundation, in Newport Beach, California.

12.     Defendant MIKAELA SANFORD ("SANFORD") was a resident of Sacramento, California. SANFORD was employed in various capacities for the Edge College & Career Network, LLC and the Key Worldwide Foundation, in Newport Beach, California.

### The Enterprise

13.     The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business in Newport Beach, California, founded by William Rick Singer in or about 2007 and incorporated in the State of California in or about 2012.

14.     The Key Worldwide Foundation ("KWF") was a non-profit corporation in Newport Beach, California that Singer established as a purported charity in or about 2012. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax. KWF maintained several bank accounts (collectively, the "KWF charitable accounts").

15.     Together, The Key and KWF constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4) (the "Key Enterprise"), that is, an association in fact of entities engaged in, and the activities of which affected, interstate and foreign commerce. The Key

Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

<u>Other Relevant Entities</u>

16.     ACT, Inc. is a non-profit organization headquartered in Iowa City, Iowa that administers the ACT exam, a standardized test that is widely used as part of the college admissions process in the United States.

17.     The College Board is a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a nonprofit organization headquartered in Lawrence Township, New Jersey, the College Board develops and administers the SAT, a standardized test that, like the ACT exam, is widely used as part of the college admissions process in the United States. The College Board and ETS also develop and administer SAT subject tests, which are also used as part of the college admissions process.

18.     Georgetown University ("Georgetown") is a highly selective private university located in Washington, D.C.

19.     Stanford University ("Stanford") is a highly selective private university located in Palo Alto, California.

20.     The University of California at Los Angeles ("UCLA") is a highly selective public university located in Los Angeles, California.

21.     The University of San Diego ("USD") is a selective private university located in San Diego, California.

22.     The University of Southern California ("USC") is a highly selective private university located in Los Angeles, California.

23.    The University of Texas at Austin ("U-Texas") is a highly selective public university located in Austin, Texas.

24.    Wake Forest University ("Wake Forest") is a highly selective private university located in Winston-Salem, North Carolina.

25.    Yale University ("Yale") is a highly selective private university located in New Haven, Connecticut.

26.    The athletic teams of Georgetown, Stanford, UCLA, USD, USC, U-Texas, Wake Forest and Yale (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

27.    Each of the Universities annually receives more than $10,000 in federal grants.

Background on Standardized Testing and the College Admissions Process

28.    Most selective colleges in the United States require students to take a standardized test, such as the ACT or the SAT, as part of the admissions process.

29.    The ACT includes sections on English, mathematics, reading and science.

30.    The SAT includes sections on writing, critical reading and mathematics.

31.    The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits. In some instances, however, students with certain learning or other disabilities may qualify for extended time and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

32.     Prior to administering the ACT, test administrators must typically certify that they will administer the test in accordance with the ACT Administration Manual, and will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

33.     Similarly, prior to administering the SAT, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT is the property of the College Board, and that no one other than the student can "open a test book and see the test content."

34.     The ACT tests are sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

35.     The SAT tests are sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

36.     Most of the Universities require prospective students to submit standardized test scores as part of their application packages. When submitted, standardized test scores are a material part of the admissions process at each of the Universities.

37.     All of the Universities recruit student athletes, and typically apply different criteria when evaluating applications from students with demonstrated athletic abilities. Recruited student athletes at USC, for example, are typically considered by a designated admissions sub-committee, which gives significant consideration to their athletic abilities and which frequently admits applicants whose grades and standardized test scores are below those of other USC students, including non-recruited athletes. The admissions offices at the Universities typically allot a set number of slots to each varsity head coach for that coach's recruited athletes. At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases

significantly higher—than those of non-recruited athletes with similar grades and standardized test scores.

## Purposes of the Racketeering Conspiracy

38.     The principal purposes of the racketeering conspiracy included the following:

     a.     to facilitate cheating on college entrance exams;

     b.     to facilitate the admission of students to elite universities as recruited athletes, regardless of their athletic abilities; and

     c.     to enrich the defendants and Singer personally.

## Manner and Means of the Racketeering Conspiracy

39.     Among the manner and means by which the defendants, Singer, and others known and unknown to the Grand Jury carried out the racketeering conspiracy were the following:

     a.     facilitating cheating on the ACT and SAT exams in exchange for bribes by arranging for or allowing a third party—generally Mark Riddell, a resident of Palmetto, Florida—to secretly take the exams in place of the actual students, or to replace the students' exam responses with his own;

     b.     designating applicants as purported recruits for competitive college athletic teams, without regard for the applicants' athletic abilities, in exchange for bribes; and

     c.     concealing the nature and source of the bribe payments by funneling payments through the KWF charitable accounts.

## Acts in Furtherance of the Racketeering Conspiracy

40.     On various dates between 2011 and February 2019, the defendants, Singer, and others known and unknown to the Grand Jury committed or caused to be committed the following acts, among others, in furtherance of the racketeering conspiracy:

7

A.    Cheating on Standardized Tests

41.    Singer agreed with clients whose children were scheduled to take the SAT or ACT exams as part of the college admissions process to have Riddell either take the tests in their children's place or correct the children's answers after they had completed the tests.

42.    Parents generally paid Singer between $15,000 and $75,000 per test, typically structuring the payments as purported donations to KWF that they wired or deposited into one of the KWF charitable accounts.

43.    To facilitate the cheating, Singer counseled parents to seek extended time on the exams, including by having their children purport to have learning disabilities in order to obtain medical documentation that ACT, Inc. and the College Board typically required before granting students extended time.

44.    Singer used the purported charitable donations from parents, at least in part, to bribe DVORSKIY, who administered the SAT and ACT exams at the private school in Los Angeles, California where he worked, and WILLIAMS, who administered the exams at the public high school in Houston, Texas where she worked.

45.    At Singer's direction, MASERA sent the bribe payments to DVORSKIY— typically $10,000 per student—from one of the KWF charitable accounts.

46.    Singer initially funneled the bribe payments to WILLIAMS through FOX, but in July 2018, Singer sent WILLIAMS a $5,000 check directly.

47.    In exchange for the bribe payments, DVORSKIY and WILLIAMS allowed Riddell to secretly take the ACT and SAT tests in place of the children of Singer's clients, or to replace the children's exam responses with his own, in violation of the duty of honest services they owed to ACT, Inc. and the College Board.

48.     At Singer's direction, MASERA sent Riddell payments of approximately $10,000 per test, usually from one of the KWF charitable accounts.

49.     DVORSKIY and WILLIAMS caused the falsified exams to be returned to ACT, Inc. and the College Board via Federal Express and UPS, respectively, so that they could be scored.

B.     The Student-Athlete Recruitment Scam

50.     Parents paid Singer approximately $25 million over the period 2011 through February 2019 to bribe coaches and university administrators to designate their children as recruited athletes, or other favored admissions categories, in violation of the duty of honest services the coaches and administrators owed to their employers, thereby facilitating the children's admission to the Universities.

51.     In some instances, SANFORD and JANKE helped fabricate athletic "profiles" and other documents to bolster the students' college applications by making them appear to be highly successful high school athletes when in fact they were not.

52.     SANFORD also took online classes in place of certain students, so that the students could submit the grades SANFORD earned in their names as part of their application packages.

i.     Yale University

53.     As one example of the recruitment scam, Singer agreed in or about November 2017 to facilitate the admission of an applicant to Yale ("Yale Applicant 1"), in exchange for a payment of $1.2 million from Yale Applicant 1's parents.

54.     On or about November 10, 2017, Singer sent actual biographical information concerning Yale Applicant 1, which contained no mention of soccer, to JANKE, and instructed JANKE to create a falsified athletic profile that would be used to support the student's application. Singer wrote in an email:  "[C]ould you please create a soccer profile asap for this girl who will

be a midfielder and attending Yale so she has to be very good. Needs to play Academy and no high school soccer, put down you and or Ali [KHOSHROSHAHIN] as coaches for Academy FC Newport etc … awards and honors – more info to come – need a soccer pic probably Asian girl."

55.     In a subsequent email, Singer instructed JANKE to add to the profile that Yale Applicant 1 had been on the "JR National Development Team in China," noting, "we are saying she got hurt this past spring, so was not recruited till now as she got her release late summer."

56.     After JANKE completed the fake profile, which described Yale Applicant 1 as the co-captain of a prominent club soccer team in southern California, Singer sent the profile to Rudolph "Rudy" Meredith, who was the head coach of the Yale women's soccer team.

57.     Meredith designated Yale Applicant 1 as a recruit for the Yale women's soccer team despite the fact that, as Meredith knew at the time, Yale Applicant 1 did not play competitive soccer.

58.     On or about January 1, 2018, after Yale Applicant 1 was admitted to Yale, Singer mailed Meredith a check for $400,000, drawn on one of the KWF charitable accounts.

59.     In or about the spring and summer of 2018, Singer's client paid Singer approximately $1.2 million in multiple installments, including approximately $900,000 that was paid into one of the KWF charitable accounts.

    ii.    USC

60.     Singer similarly bribed VAVIC, JANKE, KHOSROSHAHIN, HEINEL and others at USC to designated students as recruited athletes.

61.     For example, Singer directed payments totaling approximately $350,000 to a private soccer club controlled by JANKE and KHOSROSHAHIN.

62.     In exchange for these payments, JANKE and KHOSROSHAHIN designated four children of Singer's clients as recruits for the USC women's soccer team, despite the fact that none of those children played competitive soccer.

63.     Likewise, Singer and his co-conspirators made payments totaling $250,000 to a bank account at USC that funded VAVIC's water polo team.

64.     In exchange for these payments, VAVIC designated two students as recruits for the water polo team, thereby facilitating the students' admission to USC.

65.     Singer also made private school tuition payments for VAVIC's children—under the guise of a fabricated scholarship—via checks drawn on one of the KWF charitable accounts and sent to the school via U.S. Mail, in exchange for VAVIC's commitment to designate Singer's clients as recruits for the USC water polo team in the future.

66.     On multiple occasions between 2014 and 2018, Singer's clients made payments of more than $1.3 million to USC accounts controlled by HEINEL, typically an account for the USC Women's Athletic Board. Singer's clients paid between $50,000 and $100,000 per student by check sent to HEINEL, typically via U.S. mail or a private, interstate commercial carrier.

67.     Singer also entered into a sham consulting agreement with HEINEL, pursuant to which, beginning in July 2018, he directed payments of $20,000 per month to HEINEL personally via checks drawn on one of the KWF charitable accounts and sent to HEINEL via U.S. Mail.

68.     In exchange for the bribe payments, HEINEL helped facilitate the admission of more than two dozen students as recruited athletes, even though many of those students had fabricated athletic credentials and some did not even play the sports they were purportedly being recruited to play.

11

69.     For example, in or about September 2016, HEINEL agreed with Singer to facilitate the purported recruitment of a student, USC Applicant 1, onto the USC women's crew team even though the applicant had no prior crew experience.

70.     On or about September 20, 2016, Singer sent an email to JANKE attaching the transcript and test scores of USC Applicant 1. Singer wrote: "to be a coxswain at USC through HEINEL. A profile needs to be completed. Picture coming."

71.     In a subsequent email exchange, Singer provided JANKE with a falsified list of regattas to list on USC Applicant 1's profile.

72.     On or about October 5, 2016, Singer sent USC Applicant 1's profile, transcripts and scores to HEINEL. The profile included a picture of USC Applicant 1 on a rowing ergometer.

73.     On or about October 7, 2016, Singer reported back to JANKE that HEINEL wanted a photo of USC Applicant 1 in a "boat" and asked JANKE to find examples online where it is "tough to see the face."

74.     JANKE provided Singer with a number of different options—none of which depicted USC Applicant 1—one of which Singer then sent to HEINEL.

75.     On or about October 27, 2016, the USC athletic admissions subcommittee granted USC Applicant 1 conditional acceptance to USC, pursuant to which she would be admitted to the university on the condition that she met certain requirements, including that she register with the NCAA and meet all NCAA eligibility requirements.

76.     On or about October 29, 2016, Singer sent an email to the father of USC Applicant 1 instructing him to mail a $50,000 check, payable to USC Athletics, to HEINEL at her office address.

77.     HEINEL received the check on or about November 2, 2016.

12

78.     On or about March 30, 2017, MASERA sent an email to the parents of USC Applicant 1 attaching an invoice in the amount of $200,000 for their purported "pledge" to KWF.

79.     On or about April 10, 2017, the parents of USC Applicant 1 wired $200,000 into one of the KWF charitable accounts.

80.     Thereafter, HEINEL agreed with Singer to facilitate the purported recruitment of another student, USC Applicant 2, who had no crew experience, onto the women's crew team.

81.     At HEINEL's request, Singer directed the parents of USC Applicant 2 to make a donation of $50,000 to an athletic department account at USC controlled by HEINEL.

82.     In or about December 2017—after USC Applicant 2 was conditionally admitted to USC as a purported recruit for the women's crew team—HEINEL received a $50,000 check from the parents of USC Applicant 2, payable to an athletic department account HEINEL controlled.

83.     On or about February 6, 2018, the parents of USC Applicant 2 caused $200,000 to be wired into one of the KWF charitable accounts.

iii.     Georgetown

84.     Between 2012 and 2018, Singer paid ERNST bribes, falsely labeled as "consulting" fees, totaling more than $2.7 million. Singer typically made the payments from one of the KWF charitable accounts and sent them to ERNST via U.S. Mail, including in at least one instance to ERNST's residence in Falmouth, Massachusetts.

85.     In exchange for the bribes, ERNST designated at least 12 applicants as recruits for the Georgetown tennis team, including some who did not play tennis competitively, thereby facilitating their admission to Georgetown.

13

86.     For example, on or about August 19, 2015, at Singer's instruction, Georgetown Applicant 1 forwarded to ERNST an email Singer had drafted on his behalf. The email contained falsified information concerning Georgetown Applicant 1's purported tennis abilities. In fact, Georgetown Applicant 1 did not play competitive tennis.

87.     ERNST forwarded the email to a Georgetown admissions officer.

88.     On or about August 21, 2015, ERNST wrote to the same admissions officer to "confirm my usage of three spots" ERNST had been allocated for student admissions to Georgetown, as part of the tennis recruitment process.

89.     ERNST allocated all three spots to the children of Singer's clients, including Georgetown Applicant 1, despite the fact that none of them played competitive tennis.

90.     On or about April 22, 2016, MASERA sent an email to the parents of Georgetown Applicant 1 attaching an invoice in the amount of $400,000 for their purported "private contribution" to KWF.

91.     On or about April 28, 2016, the parents of Georgetown Applicant 1 caused $400,000 to be sent to one of the KWF charitable accounts.

92.     Between approximately September 11, 2015 and August 29, 2016, ERNST received checks totaling $700,000 from one of the KWF charitable accounts.

          iv.     UCLA

93.     As another example, in or about 2016, Singer agreed with the parents of an applicant to UCLA ("UCLA Applicant 1") to use bribes to facilitate their daughter's admission to UCLA as a purported soccer recruit, even though she did not play competitive soccer.

94.     On or about April 6, 2016, Singer emailed KHOSROSHAHIN a falsified soccer profile for UCLA Applicant 1.

14

95. On or about May 20, 2016, KHOSROSHAHIN forwarded the soccer profile to SALCEDO.

96. On or about May 24, 2016, the parents of UCLA Applicant 1 emailed Singer their daughter's high school transcript and standardized test scores.

97. Singer forwarded the transcript and test scores to SALCEDO, who forwarded them to a UCLA women's soccer coach.

98. On or about June 28, 2016, the UCLA Student-Athlete Admissions Committee approved UCLA Applicant 1 for "provisional student-athlete admission," pursuant to which she would be admitted to the university on the condition that she met certain requirements, including that she successfully completed her senior year of high school and participated on the UCLA team as a student-athlete for a minimum of one full academic year.

99. On or about July 6, 2016, SALCEDO emailed Singer that UCLA Applicant 1 had been provisionally admitted to the university as a student-athlete.

100. On or about July 7, 2016, Singer directed a payment of $100,000 from one of the KWF charitable accounts to a sports marketing company SALCEDO controlled.

101. On or about July 8, 2016, MASERA emailed a $250,000 invoice to the mother of UCLA Applicant 1. The invoice stated: "Private Contribution – Letter of receipt will be provided upon payment."

102. On or about July 11, 2016, the father of UCLA Applicant 1 emailed Singer asking him to confirm in writing that the $250,000 would be returned in the event his daughter did not receive final admission to UCLA.

103. Singer replied that he would return the money in the event UCLA Applicant 1 did not receive final admission to UCLA.

15

104.   On or about July 15, 2016, the parents of UCLA Applicant 1 donated 2,150 shares of Facebook, Inc. stock to KWF as a purported charitable contribution.

105.   On or about July 18, 2016, Singer mailed KHOSROSHAHIN a check for $25,000, drawn on one of the KWF charitable accounts.

106.   On or about July 21, 2016, MASERA sent the parents of UCLA Applicant 1 a letter, signed by Singer, acknowledging their purported charitable contribution to KWF of $251,159. The letter stated: "Your generosity will allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth."

107.   As yet another example, on or about October 24, 2018, Singer mailed SALCEDO a check for $100,000, drawn on one of the KWF charitable accounts.

108.   In exchange for that bribe, SALCEDO designated the son of another one of Singer's clients as a recruit for the UCLA men's soccer team, thereby facilitating his admission to UCLA, despite the fact that the student did not play competitive soccer.

109.   Following the student's admission to UCLA, Singer again paid KHOSROSHAHIN $25,000 for facilitating the transaction.

     v.   <u>Wake Forest</u>

110.   In or about 2017, Singer directed $100,000 from one of the KWF charitable accounts to be sent to FERGUSON, including a $10,000 check to the Wake Forest Deacon Club, a $40,000 check to Wake Forest Women's Volleyball, and a $50,000 check to a private volleyball camp FERGUSON controlled.

111.   In exchange for this money, FERGUSON agreed to designate the daughter of one of Singer's client—who had previously applied to Wake Forest and been placed on the wait list— as a recruit for the women's volleyball team, thereby facilitating her admission to the university.

    vi.   Stanford

112.   In or about the summer of 2017, John Vandemoer, the head coach of the Stanford sailing team, agreed to designate the child of one of Singer's clients ("Stanford Applicant 1") as a recruit for the Stanford sailing team, in exchange for a payment to Stanford sailing.

113.   In support of the student's application, JANKE created a student-athlete "profile" that was submitted to Stanford, and that falsely suggested that Stanford Applicant 1 was a competitive sailor.

114.   In May 2018, after Stanford Applicant 1 deferred his application to Stanford for one year, Singer directed a payment of $110,000 from one of the KWF charitable accounts to the Stanford sailing program in exchange for Vandemoer's agreement to designate Stanford Applicant 1 as a sailing recruit in the following year's recruitment cycle.

115.   In or about the summer of 2018, after Stanford Applicant 1 decided to attend a different university, Vandemoer agreed with Singer to use that same recruiting spot for the child of another one of Singer's clients ("Stanford Applicant 2"), in exchange for a $500,000 payment to the Stanford sailing program.

116.   In support of the student's application, Singer, together with others, created documents falsely indicating that the student was a competitive sailor, although the student in fact had minimal sailing experience.

117.   Although that student ultimately did not apply to Stanford, Singer directed a payment of $160,000 from one of the KWF charitable accounts to the Stanford sailing program.

118.   Vandemoer agreed with Singer that the payment would serve as a "deposit" for a future student's purported recruitment.

vii.   U-Texas

119.   In or about 2015, FOX introduced Singer to a tennis coach at U-Texas for the purpose of facilitating the admission of a student to the university, through bribery, as a purported athletic recruit.

120.   Singer paid the coach approximately $100,000.

121.   In exchange for the bribe, the U-Texas coach designated the son of one of Singer's clients, who did not play tennis competitively, as a recruit for the university's tennis team, thereby facilitating his admission to U-Texas.

122.   Singer paid FOX $100,000 for assisting with the bribe transaction.

viii.   USD

123.   FOX arranged similar bribes, on two occasions, with a varsity sports coach at USD.

124.   In or about 2016, in exchange for a bribe paid through FOX, the coach designated the son of one of Singer's clients, who did not play the sport, as a recruit for the university's team, thereby facilitating his admission to USD.

125.   Singer paid FOX approximately $100,000 for arranging the bribe.

126.   In or about 2017, in exchange for the promise of an additional bribe, the coach designated another student as a recruit to manage the coach's team, thereby facilitating her admission to USD.

127.   Although the student ultimately decided not to attend USD, Singer paid the USD coach $10,000 for his help in securing her admission.

## COUNT ONE

Racketeering Conspiracy

(18 U.S.C. § 1962(d))

The Grand Jury charges:

128.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-127 of this Indictment.

129.    From in or about 2011, and continuing through February 2019, in the District of Massachusetts and elsewhere, the defendants,

(1) GORDON ERNST,
(2) DONNA HEINEL,
(3) LAURA JANKE,
(4) ALI KHOSROSHAHIN,
(5) STEVEN MASERA,
(6) MIKAELA SANFORD,
(7) MARTIN FOX,
(8) IGOR DVORSKIY,
(9) LISA "NIKI" WILLIAMS,
(10) WILLIAM FERGUSON,
(11) JORGE SALCEDO, and
(12) JOVAN VAVIC,

being persons associated with or employed by The Key Enterprise, an enterprise engaged in, and the activities of which affected interstate and foreign commerce, conspired with others known and unknown to the Grand Jury to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5), consisting of multiple acts indictable under:

a.    Title 18, United States Code, Section 1341 (relating to mail fraud);

b.    Title 18, United States Code, Sections 1341 and 1346 (relating to honest services mail fraud);

c.    Title 18, United States Code, Section 1343 (relating to wire fraud);

    d.  Title 18, United States Code, Sections 1343 and 1346 (relating to honest services wire fraud); and

    e.  Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments).

130.    It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

All in violation of Title 18, United States Code, Section 1962(d).

## RACKETEERING FORFEITURE ALLEGATION
### (18 U.S.C. § 1963(a))

The Grand Jury further finds that:

131.    Upon conviction of the offense in violation of Title 18, United States Code, Section 1962(d), set forth in Count One of this Indictment, the defendants,

(1) GORDON ERNST,
(2) DONNA HEINEL,
(3) LAURA JANKE,
(4) ALI KHOSROSHAHIN,
(5) STEVEN MASERA,
(6) MIKAELA SANFORD,
(7) MARTIN FOX,
(8) IGOR DVORSKIY,
(9) LISA "NIKI" WILLIAMS,
(10) WILLIAM FERGUSON,
(11) JORGE SALCEDO, and
(12) JOVAN VAVIC,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963:

a.    any interest the defendant has acquired or maintained in violation of Title 18, United States Code, Section 1962;

b.    any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise established, which the defendant operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

c.    any property constituting, or derived from, any proceeds which the defendant obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Title 18, United States Code, Section 1962.

The property to be forfeited includes, but is not limited to, the following assets:

a.    Chevy Chase country club membership, as owned by Ernst;

b.    25 Gang Way, Unit 25, Falmouth, MA 02540, as owned by Ernst;

c.    Vanguard account ending in x9912, as owned by Ernst;

d.    $2,719,963.78, to be entered in the form of a forfeiture money judgement against Ernst;

e.    $160,000, to be entered in the form of a forfeiture money judgement against Heinel;

21

f.   $356,047, to be entered in the form of a forfeiture money judgment against Khosroshahin and Janke;

g.   $75,000, to be entered in the form of a forfeiture money judgment against Khosroshahin;

h.   $7,750, to be entered in the form of a forfeiture money judgment against Janke;

i.   $429,300, to be entered in the form of a forfeiture money judgment against Fox;

j.   $198,000, to be entered in the form of a forfeiture money judgment against Dvorskiy;

k.   $5,000, to be entered in the form of a forfeiture money judgment against Williams;

l.   $50,000, to be entered in the form of a forfeiture money judgment against Ferguson;

m.   $200,000, to be entered in the form of a forfeiture money judgment against Salcedo; and,

n.   $119,445, to be entered in the form of a forfeiture money judgment against Vavic.

132.   If any of the property described in Paragraph 131, above, as being forfeitable pursuant to Title 18, United States Code, Section 1963(m), as a result of any act or omission of the defendant --

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m) to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 131 above.

All pursuant to Title 18, United States Code, Section 1963.

A TRUE BILL

FOREPERSON

ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: MARCH 5, 2019
Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK
3/5/19

SEALED

23

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>vs.<br><br>Ali Khosroshahin | <u>Western</u> Division<br><br>Case Number: <u>2:19-MJ-00987</u><br>Initial App. Date: <u>03/12/2019</u><br>Initial App. Time: <u>2:00 PM</u><br><br><u>Out of District Affidavit</u><br><u>Custody</u> |
| Plaintiff, | |
| Defendant. | Date Filed: <u>03/12/2019</u><br>Violation: <u>18: 1962</u><br>CourtSmart/ Reporter: *Amy Diaz* |

| PROCEEDINGS HELD BEFORE UNITED STATES MAGISTRATE JUDGE: Alexander F. MacKinnon | CALENDAR/PROCEEDINGS SHEET LOCAL/OUT-OF-DISTRICT CASE |
|---|---|

PRESENT:

| Bernal, Ilene | *Adam Schliefer* | None |
|---|---|---|
| Deputy Clerk | Assistant U.S. Attorney | Interpreter/Language |

☐ INITIAL APPEARANCE NOT HELD - CONTINUED
☒ Defendant informed of charge and right to: remain silent; appointment of counsel, if indigent; right to bail; bail review and
  ☐ preliminary hearing OR ☒ removal hearing / Rule 20.
☒ Defendant states true name ☒ is as charged ☐ is _____
☐ Court ORDERS the caption of the Indictment/Information be changed to reflect defendant's different true name. Counsel are directed to
  file all future documents reflecting the true name as stated on the record.
☐ Defendant advised of consequences of false statement in financial affidavit. ☐ Financial Affidavit ordered SEALED.
☒ Attorney: ~~Joseph Walsh, Panel~~ ☐ Appointed ☐ Prev. Appointed ☐ Poss. Contribution (see separate order)
  ☐ Special appearance by: *Michael H. Artan, Retained*
☐ Government's request for detention is: ☐ GRANTED ☐ DENIED ☐ WITHDRAWN ☐ CONTINUED
☐ Defendant is ordered: ☐ Permanently Detained ☐ Temporarily Detained (see separate order).
☒ BAIL FIXED AT $ *100,000.00* _____ (SEE ATTACHED COPY OF CR-1 BOND FORM FOR CONDITIONS)
☐ Government moves to UNSEAL Complaint/Indictment/Information/Entire Case: ☐ GRANTED ☐ DENIED
☐ Preliminary Hearing waived.
☐ Class B Misdemeanor ☐ Defendant is advised of maximum penalties
☐ This case is assigned to Magistrate Judge _____. Counsel are directed to contact the clerk for the
  setting of all further proceedings.
☐ PO/PSA WARRANT ☐ Counsel are directed to contact the clerk for
  District Judge _____ for the setting of further proceedings.
☐ Preliminary Hearing set for _____ at 4:30 PM
☐ PIA set for: _____ at 11:00 AM in LA; at 10:00 AM in Riverside; at 10:00 AM in Santa Ana
☐ Government's motion to dismiss case/defendant _____ only: ☐ GRANTED ☐ DENIED
☐ Defendant's motion to dismiss for lack of probable cause: ☐ GRANTED ☐ DENIED
☒ Defendant executed Waiver of Rights. ☐ Process received.
☒ Court ORDERS defendant Held to Answer to _____ District of *Mass*
  ☒ Bond to transfer, if bail is posted. Defendant to report on or before *3-25-19 @ 2:30pm* *Boston, Mass*
  ☐ Warrant of removal and final commitment to issue. Date issued: _____ By CRD: _____
  ☐ Warrant of removal and final commitment are ordered stayed until _____
☐ Case continued to (Date) _____ (Time) _____ ☐ AM / PM
  Type of Hearing: _____ Before Judge _____ /Duty Magistrate Judge.
  Proceedings will be held in the ☐ Duty Courtroom ☐ Judge's Courtroom
☒ Defendant committed to the custody of the U.S. Marshal ☐ Summons: Defendant ordered to report to USM for processing.
☒ Abstract of Court Proceeding (CR-53) issued. Copy forwarded to USM.
☐ Abstract of Order to Return Defendant to Court on Next Court Day (M-20) issued. Original forwarded to USM.
☒ RELEASE ORDER NO: *39605*
☐ Other: _____

| ☐ PSA ☐ USPO | ☒ FINANCIAL | ☐ READY |
|---|---|---|
| | | Deputy Clerk Initials *ilb* |



FILED
CLERK, U.S. DISTRICT COURT

MAR 1 2 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>        v.<br><br>*ALI KHOSROSHAHIN*<br><br>               Defendant. | **CASE NUMBER:**<br><br>*19 MJ 00987*<br><br>**ADVISEMENT OF<br>DEFENDANT'S STATUTORY &<br>CONSTITUTIONAL RIGHTS** |

*(Plaintiff,)*

You are in the United States District Court for the Central District of California because you have been charged with a crime against the United States or a violation of probation, supervised release, or pretrial release. The Court informs you that you have the following constitutional and statutory rights in connection with these proceedings:

    You have the right to remain silent. Anything you say, sign, or write can be used against you in this or in any other case.

    If you have not already received a copy of the charges, you will receive a copy today.

    You have the right to hire and be represented by a lawyer of your choosing at each and every stage of these proceedings. If you cannot afford to hire a lawyer, you can apply to the Court to have a lawyer appointed to represent you for free from the office of the Federal Public Defender or the Indigent Defense Panel. The application for free counsel includes a financial affidavit, which you must sign under penalty of perjury. If you say something on the form that is not true or leave out material information, you could be charged with another crime, such as perjury or making a false statement.

    If you are not a United States citizen, you may request that the prosecution notify your consular office that you have been arrested. Even without such a request, the law may require the prosecution to do so.

### IF YOU ARE MAKING YOUR INITIAL APPEARANCE BEFORE THE COURT

    You have a right to a bail hearing in which the Magistrate Judge will determine whether you will be released from custody before trial. If you disagree with the Magistrate Judge's decision, you can appeal that decision to another Judge of this Court. You or the prosecutor can request that the bail hearing be continued to another day.

    If you have been charged by complaint, you are entitled to a preliminary hearing within 14 days if the Magistrate Judge orders that you be detained pending trial, or 21 days if the Magistrate Judge orders that you be released pending trial. In a preliminary hearing, the prosecution will attempt to show that there is probable cause to believe that you committed the crime charged in the complaint. You will not be entitled to a preliminary hearing, however, if the prosecution obtains an indictment in your case before the time set for the preliminary hearing. (Most often, the prosecutors in the Central District of California present their cases to the grand jury before the time set for the preliminary hearing and, therefore, no preliminary hearing is held.)

### IF YOU ARE CHARGED WITH A VIOLATION OF
### YOUR CONDITIONS OF SUPERVISED RELEASE OR PROBATION

    If you are charged with a violation of the terms and conditions of your supervised release or probation and the Magistrate Judge detains you, you have the right to a preliminary hearing before a Magistrate Judge.

*continued on Page 2*

## IF YOU ARE CHARGED IN ANOTHER DISTRICT

If you have been arrested on a charge from another district, you are entitled to wait until the prosecution produces a copy of the warrant authorizing your arrest. You are also entitled to an identity hearing in which the prosecution would have the burden of proving there is probable cause to believe that you are the person named in the charges. If you are charged in a complaint from another district, you may request to have a preliminary hearing held in the charging district. If you are charged with a violation of a term of supervised release or probation imposed in another district, you have a right to a preliminary hearing, which may, depending on where the alleged violation occurred, be held either here or in the charging district.

If you want to plead guilty in the Central District of California, you may request to have your case transferred to this district. To proceed in this district, the United States Attorneys for this district and the charging district must agree to the transfer.

## IF YOU ARE APPEARING FOR ARRAIGNMENT

If you have been charged by indictment or information, you will be arraigned and may be asked to enter a not guilty plea today. After your arraignment, your case will be assigned to a District Judge of this Court for all further proceedings, unless a Judge has already been assigned.

You are entitled to a speedy and public trial by jury. The right to a jury trial can be waived.

You are entitled to see and hear the evidence and cross-examine the witnesses against you. You are entitled to the processes of the Court to subpoena witnesses on your behalf without cost to you if you are indigent. You do not have to prove your innocence. The prosecution has the burden to prove your guilt beyond a reasonable doubt.

## ACKNOWLEDGMENT OF DEFENDANT:

I have read the above Advisement of Rights and understand it. I do not require a translation of this statement nor do I require an interpreter for court proceedings.

Dated: 3/12/19

_____
[or]                                    Signature of Defendant

I have personally heard a translation in the _____ language read to me and understand the above Advisement of Rights.

Dated: _____

_____
Signature of Defendant

## STATEMENT OF THE INTERPRETER:

I have translated this Advisement of Rights to the Defendant in the _____ language.

Dated: _____

_____
Signature of Interpreter

_____
Print Name of Interpreter

## STATEMENT OF COUNSEL:

I am satisfied that the defendant has read this Advisement of Rights or has heard the interpretation thereof and that he/she understands it.

Dated: 3/12/17

_____
Signature of Attorney

Michael Artan
One Wilshire Blvd #2200
Los Angeles CA 90017
michaelartan@yahoo.com

FILED
CLERK, U.S. DISTRICT COURT

MAR 1 2 2019

CENTRAL DISTRICT OF CALIFORNIA
BY ___

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| United States of America | CASE NUMBER |
|---|---|
| PLAINTIFF | 19-MJ-00987 |
| v. | |
| ALI KHOSROSHAHIN | **DESIGNATION AND APPEARANCE OF COUNSEL** |
| DEFENDANT(S). | |

### DESIGNATION OF COUNSEL

I, the undersigned defendant in the above-numbered case, hereby designate and appoint
Michael Artan ___, Esquire, as my attorney to appear for
me throughout all proceedings in this case.

3/12/15
Date

Defendant's Signature

Los Angeles CA
City and State

### APPEARANCE OF COUNSEL

I, Michael Artan ___ Attorney at law duly admitted to
practice before the United States District Court for the Central District of California, hereby consent to my designation and
appointment as counsel for the above-named defendant. The Clerk is therefore requested to enter my appearance as
defendant's counsel.

Receipt is hereby acknowledged of a copy of the Indictment or Information in this case.

3/12/19
Date

97393
California State Bar Number

Attorney's Signature

One Wilshire Blvd #2200
Street Address

Los Angeles, CA 90017
City, State, Zip Code

213/688-0370   213/627-9201
Telephone Number        Fax Number

michaelartan@yahoo.com
E-mail Address

CR-14 (01/07)                    **DESIGNATION AND APPEARANCE OF COUNSEL**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NUMBER: |
|---|---|
| PLAINTIFF | 19 MJ 957 |
| v. | |
| ALI KHOSROSHAHIN | **WAIVER OF RIGHTS** |
| DEFENDANT. | **(OUT OF DISTRICT CASES)** |

I understand that charges are pending in the _____ District of **Massachusetts**
alleging violation of **18 USC 1962** and that I have been arrested in this district and
*(Title and Section / Probation / Supervised Release)*
taken before a United States Magistrate Judge, who has informed me of the charge(s) ~~and my rights to~~:

    (1)    have an identity hearing to determine whether I am the person named in the charges
    (2)    arrival of process;

*-Check one only-*

☐    **EXCLUDING PROBATION OR SUPERVISED RELEASE CASES:**
    (3)    have a preliminary hearing (unless an indictment has been returned or an information filed)
        determine whether there is probable cause to believe an offense has been committed by me, the
        hearing to be held in this district or the district of prosecution; and
    (4)    request transfer of the proceedings to this district under Rule 20, Fed.R.Crim.P., in order to plead
        guilty.

☐    **PROBATION OR SUPERVISED RELEASE CASES:**
    (3)    have a preliminary hearing (if the violation charged allegedly occurred in this district, and I am
        held in custody solely on that charge) under Rule 32.1(b), Fed.R.Crim.P., to determine whether
        there is probable cause to believe I have violated the terms of my probation/supervised release.

**I HEREBY WAIVE (GIVE UP) MY RIGHT(S) TO:**

☑    have an identity hearing
☑    arrival of process
☐    have a preliminary hearing
☑    have an identity hearing, and I have been informed that I have no right to a preliminary hearing
☐    have an identity hearing, but I request that a preliminary hearing be held in the prosecuting
    district.

_____
Defendant

_____
Defense Counsel   *Michael Artan*

DATE: MARCH 12, 2019

_____
United States Magistrate Judge

I have translated this Waiver to the defendant in the _____ language.

Date: _____

_____
Interpreter(if required)

*[Stamp:]* FILED CLERK, U.S. DISTRICT COURT   MAR 12 2019   CENTRAL DISTRICT OF CALIFORNIA   BY ____ DEPUTY